UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YD DEVELOPMENT LLC,<br>d/b/a The Proptech School<br><br>               Plaintiff,<br><br>   -against-<br><br>VIACHESLAV DAVIDENKO,<br>a/k/a David Davidenko,<br>d/b/a David Invest,<br>d/b/a DavidInvestAI, and<br>d/b/a Sunrise Capital Group<br><br>               Defendant. | Civil Action No.: 1:25-cv-5422<br><br>**<u>COMPLAINT</u>** |

Plaintiff YD Development LLC d/b/a The Proptech Scout ("Plaintiff") by and through their attorneys, Lewis & Lin LLC, for their Complaint against Defendant Viacheslav Davidenko, a/k/a David Davidenko d/b/a David Invest, DavidInvestAI and Sunrise Capital Group ("Defendant"), alleges as follows:

<u>STATEMENT OF THE CASE</u>

1.　　This is an action for systematic and willful copyright infringement. Over the course of a year, Defendant copied and republished forty-four (44) original video works created by Plaintiff, exploiting Plaintiff's creative efforts to build Defendant's own social media following and business.

2.　　As detailed herein, Plaintiff's videos are crafted through extensive research, on-site observation, and precise scriptwriting, then released on YouTube, Instagram, and TikTok, forming a distinctive, copyright-registered library that supports Plaintiff's expanding audience and business opportunities.

3.      Defendant's infringement was deliberate rather than accidental: after closely monitoring Plaintiff's content, Defendant reproduced Plaintiff's distinctive scripts and creative elements, and then distributed nearly identical videos on YouTube, Instagram, and TikTok—sometimes within days of Plaintiff's original publication. The scope of copying is staggering: Defendant targeted virtually every successful video Plaintiff released during the infringement period, effectively hijacking Plaintiff's content, momentum and audience for Defendant's own commercial benefit.

4.      Defendant's willful misconduct is confirmed by his own admissions. In November 2024, after YouTube notified Defendant that his channel would be terminated for copyright violations, Defendant and his "manager" emailed Plaintiff to confess and apologize for the infringement, while also seeking Plaintiff's assistance to stave off termination of Defendant's YouTube channel due to YouTube's policies for repeat copyright offenders.

5.      Defendant removed the infringing content only after amassing tens of millions of views, tens of thousands of followers, and, upon information and belief, significant business opportunities from Plaintiff's work. Defendant's Instagram and account remains active, still monetizing the stolen audience and funneling the ill-gotten traffic to channels entirely under Defendant's control.

6.      Through this action, Plaintiff seeks to hold Defendant accountable for his willful misappropriation of Plaintiff's creative content, to recover damages for the substantial harm caused, and to enjoin any further infringement.

## PARTIES

7.      Plaintiff YD Development LLC, doing business as The Proptech Scout ("Plaintiff"), is a New York limited liability company with its principal place of business in New York, New York. Plaintiff operates The Proptech Scout as a consulting, media and education platform focused on real estate and property technology. Plaintiff's principal, Derek Hsiang, creates original video content about real estate and "proptech" (property technology) which he publishes on social media to educate viewers and drive business development in the industry.

8.      Defendant Viacheslav Davidenko (also known as David Davidenko) ("Defendant" or "Davidenko") is an individual who, upon information and belief, resides in Austin, Texas.

9.      Defendant is the founder, owner, and chief operator of an online real estate investment brand often referred to as "David Invest" or "DavidInvestAI." He operates or controls multiple social media accounts under the David Invest and DavidInvestAI names, including a YouTube channel, Instagram account, and TikTok account. Defendant directs and oversees real estate investment and social media content activities through these accounts, using them to solicit viewers, sponsors, and potential real estate investors as part of his business.

10.     Defendant also operates under the unregistered trade name "Sunrise Capital Group," upon information and belief an informal d/b/a for Defendant's real-estate investment activities. Sunrise Capital's website links directly to the infringing David Invest and DavidInvestAI videos, and those videos' and their captions contain links to Sunrise Capital's website, effectively funneling the pilfered audience into Defendant's investment pipeline. Defendant's email signature cross-promotes both Sunrise Capital and David Invest, creating a self-reinforcing marketing loop entirely controlled by Defendant.

## JURISDICTION AND VENUE

11.     This action arises under the Copyright Act, 17 U.S.C. § 101 et seq. The Court has subject matter jurisdiction over this federal question pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12.     Defendant is subject to personal jurisdiction in this District under N.Y. C.P.L.R. § 302(a) and the Due Process Clause. With full knowledge that Plaintiff and its business are located in New York (Plaintiff's principal publicly presents himself as an NYC-based real-estate professional—a fact Defendant has acknowledged), Defendant purposefully directed his activities toward New York by: (a) willfully copying Plaintiff's videos, most of which were created in New York and feature New York buildings; (b) uploading and disseminating the infringing videos through interactive social media platforms (YouTube, Instagram, TikTok), used to, upon information and belief, solicit and transact with viewers, sponsors, and real estate investors in New York; (c) communicating repeatedly with Plaintiff's New York office about the infringement activity and attempting to negotiate a resolution with Plaintiff in New York; and (d) upon information and belief, deriving substantial revenue from interstate commerce, including real estate deals or investments involving New York-based investors and partnerships. Because New York City was Plaintiff's largest viewer base, Defendant's hijacking of Plaintiff's content inflicted acute injury on Plaintiff's business and reputation in this District. These contacts constitute purposeful availment, and the claims arise from Defendant's New-York-directed activities; exercising jurisdiction therefore comports with fair play and substantial justice.

13.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1400(a) and 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in this District. This includes Defendant's unauthorized exploitation of Plaintiff's New York-created works via online platforms accessible in New York, Defendant's multiple

communications with Plaintiff in New York, and the resulting injury to Plaintiff's business, goodwill, and reputation in New York.

## FACTUAL BACKGROUND

**Plaintiff's Original Creative Works**

14.    Since 2020, Plaintiff (through its principal) has created and published original educational video content about real estate, infrastructure, and property technology. In 2022, Plaintiff formalized these content operations under the brand name "The Proptech Scout." Plaintiff's videos are typically short (around one minute) and are distributed on platforms like YouTube (as "Shorts"), Instagram (as Reels), and TikTok. The primary purpose of the content is to educate viewers on unique real estate and tech topics while also driving interest in Plaintiff's professional services (consulting, sponsorships, and networking opportunities).

15.    Each of Plaintiff's videos is the product of extensive original research and creative effort. Plaintiff's content creation process involves, inter alia: personal site visits to locations featured in the videos; discussions with local experts, guides, or residents; reviews of books, news archives, and online resources; and the synthesis of complex historical, financial, or technical information into an accessible narrative. Plaintiff often derives video ideas from firsthand experiences—indeed, approximately 40 of the 44 videos that Defendant later infringed were based on buildings or sites that Plaintiff's principal personally visited in preparation for the content. Through this rigorous process, Plaintiff uncovers or curates numerous specific facts and story details that are not obvious from public sources, contributing significant original value to each video's narrative.

16.    Plaintiff's videos are highly distinctive in their presentation and expression. The creator writes 100% of each script himself, crafting a unique "hook" or opening line to grab

attention, followed by a carefully structured sequence of facts and insights. The opening hook is often a provocative or curious statement that reflects considerable creative thought and skill. The narration then weaves together curated factual details (sometimes even including humorous or hyperbolic fabricated details for effect) in a logical story progression. Plaintiff's editorial choices— such as which data points to emphasize, which historical anecdotes to include, and how to simplify complex topics—reflect original judgment and expertise. Even where a video might present well-known landmarks or news, Plaintiff's angle and storytelling style are unique. In sum, each video constitutes an original work of authorship, exhibiting creative selection, coordination, and presentation of content that is exclusive to Plaintiff.

17.     In addition to the content itself, Plaintiff has developed a strategic publishing cadence across multiple platforms. Because Plaintiff's audience spans YouTube, Instagram, and TikTok, Plaintiff staggers the release of videos on different platforms to maximize engagement and avoid "cannibalization" of views (where posting the same content simultaneously might split or dilute viewership). For example, Plaintiff might first publish a video on YouTube, then wait several days or weeks before posting the same video on Instagram, thereby allowing the YouTube version to garner a dedicated audience and algorithmic momentum before the content appears elsewhere. This timed release strategy, along with adjustments in format for each platform, is a key element of Plaintiff's business model to optimize reach and sustain growth. Plaintiff's ability to control the timing and exclusivity of his content on each platform is thus commercially important in maintaining the Proptech Scout brand's distinctiveness and value.

18.     Plaintiff is the owner of valid and subsisting copyrights in the original video works described in this Complaint. All of the videos at issue have been registered with the

United States Copyright Office. A complete list of the works and their U.S. Copyright Office registration numbers are provided in an Exhibit A to this Complaint.

**Defendant's Systematic Infringement**

19.     Upon information and belief, in or about early November 2023, Defendant embarked on a systematic campaign to copy Plaintiff's video content for his own use. Around this time, Plaintiff's online presence was experiencing viral growth (with several videos gaining millions of views), and Defendant, seeing an opportunity, began downloading, imitating, or transcribing Plaintiff's newly released videos. Defendant would then recreate those videos under the "David Invest" banner, featuring Defendant (or another narrator) presenting the same narratives, facts, and even phrasing that Plaintiff had created, with minimal changes. This infringement scheme continued unchecked for approximately twelve months, from November 2023 through late 2024, resulting in a trove of copied content on Defendant's social media channels.

20.     Over that one-year period, Defendant copied at least 44 of Plaintiff's original videos, essentially piggybacking on nearly every popular video Plaintiff published during that time. The copying was not limited to general subject matter or coincidental overlap. Rather, Defendant appropriated the core creative expression of Plaintiff's works.

21.     Many of Defendant's videos begin with the same or trivially paraphrased opening lines as Plaintiff's videos, replicating the unique way Plaintiff grabbed the audience's attention. Defendant lifted specific factual anecdotes, statistics, and insights that Plaintiff had unearthed or highlighted in his research – including some details that Plaintiff intentionally embellished or fabricated for storytelling effect. Notably, even Plaintiff's deliberate fictional elements or minor

factual inaccuracies appear in Defendant's versions, demonstrating that Defendant copied Plaintiff's scripts verbatim rather than performing independent research.

22.    Defendant mirrored the sequence and flow of information in Plaintiff's videos. The order in which historical background, problem setup, and "punchline" payoff are presented in Defendant's videos tracks Plaintiff's narrative structure, reflecting Plaintiff's creative judgment in how to tell the story.

23.    Defendant copied Plaintiff's tone and style – for example, using the same analogies, joke asides, or dramatic phrasing found in Plaintiff's narration. Where Plaintiff's videos had a particular framing device or theme, Defendant often incorporated the same device in his version, merely substituting his own voice (or AI narration) or footage.

24.    Defendant attempted to disguise his copying by making superficial changes. For instance, Defendant sometimes reworded a sentence or two, or used different background images or stock footage in his edited video. However, these minor alterations did not prevent the infringing videos from being substantially similar (indeed, virtually identical in substance) to Plaintiff's copyrighted works. In two cases, Defendant's slight rephrasing introduced errors or nonsensical bits of information, betraying the fact that he was reverse-engineering Plaintiff's script without genuine understanding. In short, Defendant's videos feel like clones of Plaintiff's, with Defendant essentially presenting Plaintiff's research and stories as his own, under a thin veneer of cosmetic changes.

25.    Defendant's infringement was systematic in both timing and distribution. When Plaintiff published a successful new video, Defendant typically reproduced and posted his knock-off version, sometimes within days. Moreover, Defendant did not limit himself to a single platform: he uploaded the copied video to YouTube, Instagram, and TikTok in quick succession,

in order to maximize its reach using Plaintiff's content. This immediate multi-platform distribution completely undermined Plaintiff's strategic cadence (described above). By the time Plaintiff would post his own video to a second platform, much of the audience had already been captured by Defendant's prior post of the same content. In effect, Defendant turned Plaintiff's staggered release strategy against him, seizing the opportunity to be first to disseminate Plaintiff's content on each platform and attracting viewers who might otherwise have watched the content from Plaintiff's official account.

26.    Through the unlawful practice outlined above, Defendant built large followings on his social media channels using Plaintiff's intellectual property. The scale of Defendant's distribution of the infringing material was enormous, as shown by available metrics upon discovery in late 2024.

27.    YouTube: All 44 copied videos were posted to the "DavidInvestAI" YouTube channel, each corresponding to one of Plaintiff's originals. In aggregate, these infringing YouTube videos amassed approximately 28 million views based on Plaintiff's content. This contributed substantially to the channel's growth, which reached about 80,000 subscribers by late 2024.

28.    Instagram: The same set of videos (44) was posted on Defendant's Instagram account @davidinvestai a total of 52 times (several videos were re-posted for additional exposure). These Instagram posts generated on the order of tens of millions of views collectively, driving the account to approximately 79,000 followers by November 2024. Notably, Defendant's Instagram following outpaced Plaintiff's own (Plaintiff had around 55,000 followers on Instagram at the time), a disparity largely attributable to Defendant's unauthorized reposts of

Plaintiff's hit content. The account remains active today, still capitalizing on the audience gained through those infringing posts.

29.    TikTok: Defendant likewise posted the infringing videos on TikTok under the "DavidInvestAI" account. While full analytics are not available, the volume of TikTok posts was similar to the other platforms, and the TikTok account had garnered approximately 7,000 followers before it was later made private. The infringing TikTok videos accumulated millions of views as well. Even in its private state, the account continues to exist, retaining the following built on Plaintiff's misused content.

30.    Defendant's copied works added little or no original material beyond what he took from Plaintiff. In fact, with only two exceptions, virtually 100% of the factual content in Defendant's videos was lifted from Plaintiff's videos, confirming that Defendant performed almost no independent research or addition. The absence of any meaningful transformative contribution by Defendant underscores the willful nature of the infringement. Defendant knew that Plaintiff's content was valuable and popular, and he opted to simply duplicate it wholesale rather than invest the time and effort to create his own educational narratives. By exploiting Plaintiff's labor in this way, Defendant rapidly expanded his own audience and social media metrics without undergoing the trial-and-error and creative development that Plaintiff had undertaken over years.

**Discovery of Infringement and Defendant's Admissions**

31.    Plaintiff was unaware of Defendant's copying throughout the 12 month duration of the infringement. Defendant had never sought a license or permission, and he operated under a different brand name (DavidInvestAI), so the connection was not immediately obvious. That changed on November 8, 2024, when Plaintiff stumbled upon a video on YouTube by

"DavidInvestAI" that sounded uncannily familiar. Upon watching, Plaintiff realized it was a replica of one of his own recent videos, with an AI voice narrating Plaintiff's script almost verbatim. Alarmed, Plaintiff investigated the DavidInvestAI YouTube channel and quickly uncovered a trove of infringing content. In total, Plaintiff identified 44 videos on Defendant's channel that appeared to be copies of his work

32.     Plaintiff also discovered that Defendant was disseminating the same infringing videos on Instagram and TikTok. The sheer breadth of the infringement (dozens of videos across three platforms) made clear that this was a systematic campaign rather than an isolated mistake.

33.     Plaintiff immediately took action by utilizing YouTube's copyright infringement reporting tools on November 8, 2024. Plaintiff submitted takedown notices for each of the 44 infringing YouTube videos, asserting rights under the Digital Millennium Copyright Act (DMCA). YouTube responded swiftly: the platform recognized the validity of Plaintiff's claims and removed all 44 videos from Defendant's channel. In accordance with YouTube's standard policy for repeat copyright offenders, YouTube informed Defendant that his channel would be permanently terminated in 14 days (the "three-strike" rule) unless Defendant resolved the disputes with the copyright claimant (Plaintiff) to YouTube's satisfaction.

34.     Facing the loss of his channel and audience, Defendant and his "manager" contacted Plaintiff directly via email in an attempt to stave off termination. Their communications contained explicit admissions of the infringing conduct.

35.     On November 8, 2024, a Julia Ezikhova, claiming to be Defendant's "manager," and using an email address connected to Sunrise Capital, emailed Plaintiff apologizing for the copying of Plaintiff's content and stating that the videos would be removed from the David Invest platforms.

36.      Approximately an hour and twenty minutes later, Davidenko also emailed Plaintiff from his Sunrise Capital email address. Davidenko acknowledged that he was the creator and operator of "David Invest" and that, regarding the infringing videos, "some of the ideas might appear similar to other content." Davidenko also admitted that the videos were "edited and produced entirely by [his] team." While couched as an apology for any "oversight," Davidenko's message effectively affirmed that his team had access to and used Plaintiff's work and that he, as the "creator" of David Invest and leader of that team, bore responsibility. Davidenko offered to immediately delete the videos and asked for guidance on how to resolve the matter amicably.

37.      In the early hours of the next day, Davidenko sent another longer email in which he attempted to explain the situation. He claimed, "Our intention was to draw inspiration from general themes rather than reproducing your original work." Davidenko's explanation thus served as further evidence that Defendant knew he was copying Plaintiff's content and was trying to reframe it as taking inspiration from broad themes. In reality, as demonstrated by the nearly identical scripts, Defendant went far beyond inspiration and engaged in wholesale duplication of expression.

38.      On November 10, after Plaintiff had not withdrawn the takedown notices, Davidenko emailed again, stating: "I have taken steps to ensure that the content in question is no longer publicly accessible in its current form." He further promised, "Moving forward, I will continue to produce content that reflects my unique perspective and experiences in the field…while respecting the intellectual property rights of others." Davidenko thus confirmed that he had the ability to and did remove or alter the content as demanded and gave written assurances intended to dissuade Plaintiff from further legal action.

39.    Despite Defendant's apologetic tone and promises, Plaintiff was not satisfied that the infringement would truly cease or be remedied. Plaintiff did not retract the YouTube claims. Defendant, for his part, did not propose any concrete compensation for past infringement or any formal agreement. Thus, the YouTube channel deletion proceeded. On or about November 22, 2024, YouTube terminated the "DavidInvestAI" channel after the 14-day period lapsed without retraction. Around the same time, upon information and belief, Defendant took down or hid infringing content on other platforms: the DavidInvestAI TikTok account was set to private (concealing its videos) and the infringing videos were removed from the @davidinvestai Instagram feed.

40.    In the weeks following the discovery of the infringement, Plaintiff took steps to strengthen and protect its rights. On November 13, 2024, Plaintiff filed for expedited copyright registrations on a number of the most-viewed videos that had been infringed. By late December 2024, Plaintiff had submitted copyright registration applications for all 44 infringed videos. The U.S. Copyright Office subsequently issued registrations confirming Plaintiff's ownership of these works (see Exhibit A).

41.    On May 14, 2025, Davidenko emailed Plaintiff with the subject "A simple request that benefits us and our real estate community," effectively seeking Plaintiff's help in undoing the damage to Defendant's business due to Defendant's YouTube channel being terminated. In this message, Davidenko emphasized what he had lost due to the copyright claims. He wrote that the YouTube channel's removal had "resulted in the loss of years of educational content, a community of over 80,000 subscribers, and valuable industry partnerships." He then requested Plaintiff's "preliminary approval" for a channel reinstatement, suggesting that Plaintiff agree to retract the copyright strikes in YouTube's system. Davidenko attempted to frame this as a

mutually beneficial outcome, although he notably stated that he was making this request "without…constituting any admission regarding the merits of the original concerns" (despite his prior clear admissions of copying). Plaintiff did not respond to this request.

42.    One week later, Davidenko sent another email titled "Request Regarding DavidInvest YouTube Channel - Copyright Retraction." This time, he provided detailed instructions (likely provided by YouTube) on how Plaintiff could retract the copyright takedown claims. Importantly, Davidenko expressly acknowledged Plaintiff's ownership in the content: he stated that a retraction "does not waive any of your underlying copyright ownership or rights to your content." Davidenko again asked for an "amicable" resolution. Plaintiff did not respond, and no retraction was given.

43.    These May 2025 communications further highlight the commercial impact of the infringement. Davidenko's plea demonstrates that Defendant's business was heavily dependent on the infringing content; losing it meant losing an 80,000-strong audience and partnership opportunities. In essence, Defendant admitted that he had built a significant revenue-generating platform on the foundation of Plaintiff's work. While Plaintiff declined to restore Defendant's channel, these admissions highlight the extent of unjust gains in this case.

**Commercial Impact and Audience Disparity**

44.    Defendant's systematic copying did more than just violate Plaintiff's rights in the abstract – it had tangible negative effects on Plaintiff's business and audience growth, while unjustly enriching Defendant. The situation by late 2024 illustrated a stark audience disparity created by the infringement:

45.    On YouTube, prior to termination, Defendant's channel had roughly 80,000 subscribers, many of whom were attracted by the very videos Defendant copied from Plaintiff.

(Plaintiff's own YouTube channel, by comparison, had about 113,000 subscribers by mid-2025 after much effort and consistent original content creation.) The infringement thus helped Defendant rapidly approach Plaintiff's stature on YouTube without the same level of investment or creativity.

46.    On Instagram, as noted, Defendant amassed approximately 79,000 followers by the time Plaintiff discovered the copying. Plaintiff's Instagram following at that time was around 55,000, even though the underlying content was Plaintiff's. The difference was largely due to Defendant's tactic of immediately posting content to Instagram, and posting the content multiple times. Defendant essentially scooped Plaintiff on his own content, thereby siphoning off followers who might have followed Plaintiff had he been first to post his original work on that platform. In this way, Defendant's actions directly cannibalized Plaintiff's audience.

47.    On TikTok, Defendant had a modest following (~7,000), whereas Plaintiff's TikTok had about 68,000 followers by the end of 2023. Although TikTok was not Plaintiff's primary platform, Defendant's unauthorized posts there still accrued substantial views that could have belonged to Plaintiff, and they helped maintain Defendant's overall visibility in the marketplace.

48.    Upon information and belief, approximately 60% or more of Defendant's total social media success during the relevant period is directly attributable to content copied from Plaintiff's works. In other words, a majority of Defendant's popular videos and follower engagement traces back to videos that originated with Plaintiff's creativity. By riding on Plaintiff's hits, Defendant dramatically boosted his view counts, follower counts, and credibility in the real estate content space—all at Plaintiff's expense—and, by embedding direct clickable

links to his "Sunrise Capital" investment arm in those infringing posts, converted the misappropriated audience into a steady pipeline of prospective investors under his control.

49.    Meanwhile, the harm to Plaintiff from this copying was significant. Plaintiff's unique value proposition is its creative storytelling and reliable output of engaging content. By flooding the social media channels with duplicate versions of Plaintiff's work, Defendant not only drew eyeballs away from Plaintiff's originals but also muddied the association between Plaintiff and its content. Some viewers may have encountered Defendant's videos first and assumed Plaintiff was the imitator, or never discovered Plaintiff's channel at all because they were satisfied by Defendant's reposts. This dynamic undermined Plaintiff's brand distinctiveness and the goodwill it had been building. It also interfered with platform performance metrics for Plaintiff – for example, the copied videos sometimes outperformed Plaintiff's own uploads due to algorithm timing, causing Plaintiff's content to rank or trend lower than expected. In one notable instance in February 2024, Plaintiff released a series of videos after a creative hiatus, expecting strong performance, but the videos underperformed; unknown to Plaintiff at the time, Defendant had almost immediately posted the same content, which likely split the audience and confounded the algorithms.

50.    Further, Plaintiff's content serves a critical commercial purpose beyond just ad revenue: it functions as a marketing funnel for his consulting and sponsorship business. By establishing himself as a knowledgeable and original voice in proptech, Plaintiff attracts clients, investors, and opportunities. Defendant's actions disrupted this business model. Prospective clients drawn to the content might have followed Defendant's page instead of Plaintiff's, or at least been confused about the source of the expertise. Defendant essentially diluted the market for Plaintiff's videos by turning them into a commodity that was also available through

Defendant's channels. The infringement thus had the effect of reducing the commercial utility of Plaintiff's content as a client-generation and growth engine. In sum, Defendant not only reaped profits from Plaintiff's work but also caused Plaintiff to lose potential revenues and opportunities that it would have gained had its content remained exclusive to Plaintiff.

51.    All of the foregoing demonstrates that Defendant's conduct was willful and undertaken with a clear commercial motivation. Defendant persisted in copying until forced to stop by YouTube. Even then, Defendant's primary concern was to salvage his platform (as evidenced by his pleas in May 2025) rather than to make Plaintiff whole. This lawsuit followed after it became evident that no voluntary resolution or adequate compensation would be forthcoming from Defendant.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

52.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 51 above as if fully set forth herein.

53.    Plaintiff is the owner of valid, registered copyrights in the forty-four (44) original video works described throughout this Complaint and as contained in Exhibit A. These works are original works of authorship that are fixed in a tangible medium of expression (digital video files) and are entitled to full protection under the Copyright Act, 17 U.S.C. § 101 et seq.

54.    Defendant, without any authorization, license, or consent from Plaintiff, has copied, reproduced, distributed, publicly performed, and/or created derivative works based upon Plaintiff's copyrighted works. Specifically, Defendant reproduced Plaintiff's protected scripts and audio-visual elements in Defendant's videos, and distributed those infringing videos to the public via online platforms, all for Defendant's benefit and without Plaintiff's permission.

55. The videos that Defendant published are substantially similar (indeed, in many respects virtually identical) to Plaintiff's copyrighted works, and Defendant had access to Plaintiff's works when creating his own. Plaintiff's videos were widely available on YouTube and other social media, which Defendant admitted to watching and "drawing inspiration" from. Given the verbatim replication of narrative content, there is no question that Defendant's works were copied from Plaintiff's works rather than independently created.

56. Defendant's infringement was knowing and willful.

57. Defendant engaged in a systematic, comprehensive campaign of copying over the course of a year, targeting virtually every one of Plaintiff's successful videos during that period. This was not a one-off incident or an accidental use of a clip – it was an organized effort to replicate Plaintiff's content at scale for profit.

58. Defendant effectively admitted the copying in communications to Plaintiff. Davidenko acknowledged the similarities, stating the content was made by "his team" and only thinly defended it by reference to "general themes," which is tantamount to conceding the substantial overlap. Such admissions demonstrate Defendant's awareness of the infringement.

59. Aside from perhaps two trivial details across all the videos, Defendant contributed no original research or expression of his own. In fact, virtually 100% of the factual statements and narrative elements in Defendant's videos were taken directly from Plaintiff's videos. Defendant even copied Plaintiff's unique fabricated details and minor inaccuracies, a hallmark of copying (since any independent creation would likely diverge on those arbitrary points). This overwhelming identity of content shows willfulness — Defendant made no attempt to create something new, only to appropriate.

60.     Defendant tried to cover his tracks by slightly rewording Plaintiff's scripts and substituting different imagery, and by using an AI narrated voice in place of the narration in Plaintiff's videos. These efforts at camouflage actually underscore the deliberate nature of the copying: Defendant knew he was using Plaintiff's material and took steps to obscure that fact. The clumsy rephrasing that led to factual errors is further evidence of intentional copying (and a failed attempt at that).

61.     Defendant flagrantly commercialized Plaintiff's works for his own gain. Upon information and belief, by monetizing the infringing videos through social media growth and investor leads - having linked to Sunrise Capital's website throughout the infringing posts - Defendant profited from the infringement. Defendant's motives were competitive and profit-driven, which supports a finding of willful infringement aimed at usurping the market value of Plaintiff's content.

62.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial damages, including lost advertising revenues, lost business opportunities, damage to goodwill, and dilution of the market for its original content. Much of this harm has occurred in New York, where Plaintiff's core audience was siphoned away by Defendant's misappropriation. Plaintiff is entitled to recover his actual damages and any additional profits of Defendant attributable to the infringement, pursuant to 17 U.S.C. § 504(b). In the alternative, at Plaintiff's election, Plaintiff is entitled to maximum statutory damages for each act of willful infringement, pursuant to 17 U.S.C. § 504(c). Plaintiff is also entitled to an award of his costs and attorneys' fees under 17 U.S.C. § 505, and to injunctive relief to prevent further infringement of his works by Defendant (as further stated below).

## SECOND CLAIM FOR RELIEF
## CONTRIBUTORY COPYRIGHT INFRINGEMENT
### (in the Alternative to Count I)

63.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 62 above as if fully set forth herein.

64.     To the extent Defendant claims that the infringing videos were produced not by him personally, but by his "team," Defendant knowingly and materially contributed to the infringement of Plaintiff's copyrights, and is therefore liable for contributory infringement under 17 U.S.C. § 501.

65.     Defendant was the leader and supervisor of the David Invest and DavidInvestAI content operation. By his own admission, he oversaw this production. Defendant also had actual or constructive knowledge of the infringing activity—he was alerted on multiple occasions, including by Plaintiff's takedown notices and direct communications, that the videos copied Plaintiff's content. Even prior to being caught, the sheer volume and fidelity of the copied material indicate that Defendant knew that his channels were using Plaintiff's work as the basis for his videos (indeed, it was the business model).

66.     Despite this knowledge, Defendant induced, caused, or materially contributed to the infringement. He did so by directing "his team" to create content on the same topics and scripts as Plaintiff's, by providing the platforms (the social media accounts) to publish the infringing videos, and by actively promoting and monetizing those videos. Defendant exercised control over the selection of what videos to copy and the timing of their release, as well as the distribution of the videos across YouTube, Instagram, and TikTok. He also had the ability to prevent or limit the infringement but failed to do so. For example, even after Plaintiff's initial complaints, Defendant did not immediately remove all infringing content; he only did the bare

minimum under threat of YouTube deletion, and even then attempted to preserve his channel rather than cease infringement entirely.

67.     Defendant had a direct financial stake in the infringing activity. By copying Plaintiff's popular content, Defendant rapidly grew the viewership and engagement of the David Invest and DavidInvestAI social media accounts. Upon information and belief, this growth translated into concrete economic opportunities: increased advertising revenue from platforms (e.g., YouTube AdSense earnings), lucrative sponsorship or affiliate deals due to the larger audience, and enhanced ability for Defendant to attract investors or clients for his real estate ventures (as the David Invest brand was bolstered by the influx of followers and credibility). Defendant himself highlighted the "valuable industry partnerships" that were tied to the channel's success, underscoring that money and business relationships were on the line. Thus, Defendant derived direct financial benefit from the infringement.

68.     In sum, Defendant's actions satisfy all elements of contributory infringement: (1) direct infringement by third parties to the extent Defendant's "team" produced the videos; (2) Defendant had knowledge of that infringement; and (3) Defendant induced, encouraged, or materially assisted the infringement through his managerial role and provision of resources.

69.     Accordingly, Defendant is liable in the alternative as a contributory infringer.

70.     As a direct and proximate result of Defendant's contributory infringement, Plaintiff has sustained substantial damages in an amount to be proven at trial. Plaintiff is entitled to the same relief against Defendant (actual or statutory damages, profits, etc., plus fees and injunctive relief) as set forth under Count I above.

### THIRD CLAIM FOR RELIEF
### <u>VICARIOUS COPYRIGHT INFRINGEMENT</u>
### (in the Alternative to Count I)

71.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 70 above as if fully set forth herein.

72.     To the extent Defendant claims that the infringing videos were produced not by him personally, but by his "team," Defendant is vicariously liable for the copyright infringement of Plaintiff's works, in that he had (a) the right and ability to supervise or control the direct infringers' conduct, and (b) a direct financial interest in the exploitation of Plaintiff's copyrighted works, yet he failed to stop or prevent the infringement.

73.     Defendant was at all relevant times the person in charge of the infringing content creation and distribution enterprise. As the figurehead and manager of the David Invest and DavidInvestAI channels, he had the authority to instruct his subordinates and any "team"  to refrain from using Plaintiff's material, or to remove infringing videos from publication, but he did not do so until compelled by external forces. Upon information and belief, Defendant also controlled the credentials and access to the social media accounts where the infringing videos were posted, meaning he had the practical ability to take down or not post content.

74.     Defendant had a direct financial stake in the infringing activity. By copying Plaintiff's popular content, Defendant rapidly grew the viewership and engagement of the David Invest and DavidInvestAI social media accounts. Upon information and belief, this growth translated into concrete economic opportunities: increased advertising revenue from platforms (e.g., YouTube AdSense earnings), lucrative sponsorship or affiliate deals due to the larger audience, and enhanced ability for Defendant to attract investors or clients for his real estate ventures (as the David Invest brand was bolstered by the influx of followers and credibility). Defendant himself highlighted the "valuable industry partnerships" that were tied to the

channel's success, underscoring that money and business relationships were on the line. Thus, Defendant derived direct financial benefit from the infringement. The infringing content acted as a draw for potential business, which is the heart of a vicarious infringer's financial interest.

75.    Because he had both the ability to control the infringing acts and a financial incentive to allow those acts to continue, Defendant is vicariously liable for the direct infringement of Plaintiff's works committed by any other persons.

76.    As a direct and proximate result of Defendant's vicarious infringement, Plaintiff has suffered damages in an amount to be proven at trial. Plaintiff is entitled to all remedies provided by the Copyright Act, including but not limited to Defendant's profits from the infringements, statutory damages (for willful infringement), attorneys' fees, and injunctive relief, as requested below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant, jointly and severally, as follows:

a.  Declare that Defendant has infringed Plaintiff's copyrights in the video works at issue, in violation of the Copyright Act, 17 U.S.C. § 501;

b.  Award Plaintiff's actual damages suffered as a result of Defendant's infringement, and any profits of Defendant attributable to the infringement, in accordance with 17 U.S.C. § 504(b); or, at Plaintiff's election, award statutory damages up to the maximum of $150,000 per work infringed for Defendant's willful copyright infringement, pursuant to 17 U.S.C. § 504(c);

c.  Award Plaintiff its full costs and reasonable attorneys' fees in this action, as provided by 17 U.S.C. § 505;

d.  Grant a permanent injunction pursuant to 17 U.S.C. § 502, enjoining Defendant and all persons in active concert or participation from continuing to infringe Plaintiff's copyrighted works, and specifically prohibiting Defendant from copying, reproducing,

distributing, or publicly displaying any of Plaintiff's copyrighted videos without authorization. Such injunction shall further require Defendant to remove or delete any remaining copies of Plaintiff's works in his possession or control, including from any social media accounts or storage systems under his custody (except for archival copies preserved for purposes of this litigation);

e.  Order, pursuant to 17 U.S.C. § 503, that all infringing copies or derivatives of Plaintiff's works, and all masters, files, or digital records used to create such infringing copies, be impounded and destroyed or otherwise reasonably disposed of;

f.  Award Plaintiff pre-judgment and post-judgment interest on all monetary awards to the maximum extent permitted by law;

g.  Order Defendant to provide a full and complete accounting of all revenue, profits, and other benefits he obtained as a result of the infringing acts, including but not limited to ad revenue, sponsorship fees, investment capital or fees, or any other business opportunities gained or enhanced by the increased viewership from the infringing videos; and

h.  Grant such other and further relief as the Court deems just and proper under the circumstances.

## <u>DEMAND FOR TRIAL BY JURY</u>

Please take notice that Plaintiff hereby demands trial by jury for all issues so triable.

Dated: Brooklyn, New York
       June 30, 2025

Respectfully submitted,

**LEWIS & LIN, LLC**

*Michael Cilento*
David D. Lin, Esq.
Michael D. Cilento, Esq.
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
David@iLawco.com
Michael@iLawco.com
*Attorneys for Plaintiff*

**Exhibit A: Copyright Registrations**

| Registration Number | Title |
| --- | --- |
| PA 2-500-760 | The Empire State Building's Speed Run |
| PA 2-500-762 | Vegas's craziest FU money story |
| PA 2-500-764 | What Mayor Adams did here is shady af |
| PA 2-501-228 | Pay for parking, fund a UAE skyscraper |
| PA 2-501-231 | Casually one of NYC's most valuable buildings |
| PA 2-528-554 | Why is Trump Tower Las Vegas so Isolated? |
| PA 2-528-556 | Vegas's most profitable real estate flip |
| PA 2-528-557 | This was supposed to be the tallest building in the world |
| PA 2-528-557 | This was supposed to be the tallest building in the world. |
| PA 2-528-559 | Why this Vegas lot has been empty for 16 years |
| PA 2-528-561 | The bluff that changed Vegas forever |
| PA 2-528-561 | Steve Wynn's legendary real estate career.. and shameful ending |
| PA 2-528-563 | This man bought half of the Vegas Strip as a side hustle |
| PA 2-528-566 | Trump's Mar a Lago Loopholes |
| PA 2-528-571 | America's new tallest tower won't be in NYC |
| PA 2-528-572 | What is Mar a Lago really worth? |
| PA 2-528-573 | The Billion Dollar Flip |
| PA 2-528-574 | The Proposed 4000-Foot Long NYC Supertall Tower |
| PA 2-528-575 | Burj Khalifa's 3 Construction Tech Breakthroughs |
| PA 2-528-576 | Roman Concrete gets STRONGER with Age |
| PA 2-528-577 | Hong Kong has more of these than NYC |
| PA 2-528-578 | This Building Took 8 CENTURIES to Build |
| PA 2-528-580 | Rockefeller Plaza's Holdout Tenant Sandwich |
| PA 2-528-582 | Gustave Eiffel's Financial Gamble |
| PA 2-528-589 | Carl Icahn made $450mm doing nothing |
| PA 2-528-590 | How NYC could have preserved this view |
| PA 2-528-592 | London's billion dollar tent |
| PA 2-528-602 | Happy Birthday to the man who reshaped Midtown East |

| PA 2-528-603 | This Vegas hotel was thrown away because of a mistake |
| PA 2-528-607 | The Cheese Grater was 'built' 37 times |
| PA 2-528-612 | Why NYC's Supertalls are on just one block |
| PA 2-528-613 | Madison Square Garden was Built 4 Times |
| PA 2-528-614 | NYC's Smallest Property |
| PA 2-528-615 | Why Penn Station was so Ugly |
| PA 2-528-617 | Trump Tower's $50 million Tax Break |
| PA 2-528-618 | Who owns the Chrysler Building? |
| PA 2-528-621 | Why this Parisian Skyscraper is so lonely |
| PA 2-528-623 | The bluff that changed Vegas forever |
| PA 2-528-659 | 5Pointz: How a Landlord Lost to Graffiti Artists Part 1 |
| PA 2-528-660 | Trump's Chaotic GM Building Ownership |
| PA 2-528-664 | Trump Tower & The Art of Counting Wrong |
| PA 2-528-674 | The World's Largest Voluntary Demolition |
| PA 2-528-678 | NYC Flatiron Building Auctioned Off! |
| PA 2-528-679 | Trump Tower's Air Rights Assemblage |
| PA 2-528-680 | How Trump bought Mar a Lago |
| PA 2-528-682 | Why Burj Khalifa was cheaper than One World Trade Center |